Welcome all. First case for argument this morning is 15-1066 Commonwealth Scientific v. Cisco Systems. Mr. O'Quinn. We wanted, before we start the clock running, we just had a few preliminary comments about some of the markings in the briefs for both parties. As you know, legal arguments cannot be marked as confidential. It appears that in the blue brief and the reply brief in particular, that there are such markings. For example, on page 3 of the blue brief, it talks about compounding that error. Cizero's rates were based on little more than the rule of thumb. This court rejected it in Buenaloc and there are various other references to that. Page 34 of the brief and 37 and so on and so forth. That kind of marking is not proper and indeed is sanctionable. Judge Dyke, the reason that those were marked was that the underlying information from Cizero's consultant that engaged in that specific methodology was treated as confidential. In order to try to be faithful to maintaining the confidentiality of what their consultant had done, we felt that it was necessary to mark that as confidential within the briefing itself. Obviously, if the court disagrees... That's not proper. I mean, that legal argument by the case is talking about the 25% rule of thumb. That's extending confidentiality far beyond what is appropriate. Judge Dyke, obviously, I apologize for any error and take responsibility for that. Again, our intent was to try to avoid disclosing precisely what the methodology was that had been used by the consultant. We're happy, of course, to file amended copies of the briefs if it would assist the court and if the court wants to treat those portions as unredacted, assuming that there are no objections from my colleague at Cizero whose material we were attempting to try to prevent from disclosing, we certainly don't have any objections to doing that. Do you have a comment, sir? Your Honor, the only information that Cizero has requested be marked confidential is information belonging to third parties like counterparties and licenses to whom we owe either contractual duty of confidentiality or subject to the district court... You don't seem to understand. You're not supposed to mark this sort of thing as confidential. And the bar needs to understand that the fact that things are marked confidential in the district court doesn't mean that when you're making legal arguments that don't refer, for example, to profit percentages or whatever can't be marked confidential. Your Honor, for the piece, for example, that Your Honor referenced, Cizero has no objection to that being unredacted. In fact, any of Cizero's information other than third-party information, we have no objection to that being fully disclosed in the public record. We'd be happy to, I think, revisit and send an additional copy. And submit within five working days? Absolutely. Additional copy for the brief? Absolutely. Is this simply because we feel compelled to recognize that there's really a public notice function here and that the public really has a right to know the details, so we're very sensitive at the court? I appreciate that, Chief Judge Prost. And Judge Dyke, I appreciate the points that you've made and completely understand them. Again, we were just attempting to preserve the confidentiality of the arguments that had been made by Cizero's consultant. But I take the court's point and we're happy to confer with them and to submit versions in which particularly the material that you've identified has been unredacted. And we'll confer about whether there are other materials that can be unredacted as well. Thank you. Okay. We'll get started now on the arguments. Thank you. Thank you, Chief Judge Prost. May it please the court. Again, John O'Quinn on behalf of Cisco. The district court committed a series of legal errors by awarding a royalty in which it first used multi-component end products rather than ships as the royalty base. Second, used the patentee's unaccepted offer rather than the real-world license between these parties as the starting point for the rate. And third, rejected the very adjustments to that rate that this court specifically required in Erickson to account for standardization. The damages award is thus inconsistent with this court's decisions in Vernetics and Erickson, which the district court did not have the benefit of at the time that it was writing its opinion, as well as Laser Dynamics and Unilock. Can I start here with the final point you made about standardization because it was kind of confusing to me about what was happening here. There's no RAND commitment with respect to the 69 patent, right? No, that's not quite right, Chief Judge Prost. There was – there's no dispute that there was a RAND commitment with respect to – On A, right? With respect to 802.11A. With respect to 802.11G, you can see at A9, CSIRO represented to the industry that the IEEE is aware of our patents and we've agreed with the IEEE we will grant licenses under our patents on a RAND basis. And specifically referred both to A and G, but there was no actual formal agreement with respect to G. And then with respect to 802.11N, you have clearly a product of lock-in. If you look at A – But with respect to the G, for example. So there's no dispute that there was no RAND commitment with respect to that. There's no dispute that there was no RAND commitment that was ultimately made. There was certainly a representation to the community, which explains part of why it was that – No, I understand that. So in the absence of a RAND commitment, I mean, Erickson and other cases have referred to what happens when there's a RAND commitment. And Erickson explicitly talked about adjusting the Georgia-Pacific factors in that regard. But is it your view that even in the absence of a RAND commitment, because it's part of the standard, the district court has to apportion the value attributable to standardization? That's part one. And the question, part two, is how does he do that? I mean, Judge Davis here did refer to it in several portions of his opinion, seeming to try to at least account for the standardization. Well, with respect to the second point, I would submit that what the district court did is exactly the opposite of what Erickson required. He did take into account the fact that there had been standardization, and he gave CSIRO the benefit of that and said, I'm going to look to things that were later in time after the market had changed because of 802.11A and 802.11G. In other words, he increased the royalty because of the lock-in rather than decreased it. Well, so what he did— Now, wait, wait. Isn't that accurate? He increased the royalty as a result of the lock-in as opposed to decreasing it. He found that factors 8, 9, and 10 all favored an upward adjustment, whereas Erickson, to come back to your first question, Judge Prost, Erickson specifically says, and this is at 1231 of that opinion, that factors 8, 9, and 10 need to be adjusted, quote, for SEP patents generally and not just for RAND-encumbered patents. And the reason for that is because when you have lock-in, then factors like 8, 9, and 10 no longer make sense the way that they do outside of standardization because it means that the reason that a particular product has commercial success or the reason competing products don't have commercial success is either the first was part of the standard and the second is not part of the standard. And how is that distinction—do we use experts to determine what the differential is between the value because of standardization and not? Well, Erickson identifies a number of ways that a court could potentially take that into account in court, including looking to things that happened pre-standardization. And here the district court didn't do that. In fact, he rejected reliance on the TLA and A-22 of his opinion precisely because it was pre-standardization. He said it was too early in time before commercialization had occurred and the market had changed. And Erickson says you may even need to adjust the time of the hypothetical negotiation to take into account the effects of standardization. And here it was a virtue, not a vice, that the TLA predated standardization. But what about other aspects of the—I understand what you're saying about that. And in particular, the suggestion that the TLA rates reflected other kinds of compensation going from Roddy or whatever the name of it is to Commonwealth, and in particular, a license on further developments with respect to the chip. Sure. Judge Dyke, well, first, the district court certainly mentioned those factors in deciding that he didn't view the TLA as a comparable license. And in determining that Cisco's damages model wasn't reliable. But he also said at page A-23 of his opinion that, quote, the primary problem with Cisco's damages model was that it uses chips rather than end products as the base. And that, of course, is legal error. I understand that. Now, with respect to the— Yeah, but what about the suggestion that the rates were distorted because there was other compensation going to Commonwealth? So a few points on that. First, by the time that the TLA was, of course, amended such that you no longer had Radiata as a party, but you actually had Cisco as a party, a number of amendments took place that would have changed the dynamic of the relationship between the parties. Did that change the relationship in this respect in terms of the royalty-free license for further developments? Judge Dyke, I'm not sure that it changed that particularly. I know that there were changes to the definition of the term product. I know that there were changes to some of the treatment of IP. But the one thing that didn't change through these amendments that would have been contemporaneous with the hypothetical negotiation was the rates and the base. And the other thing that— But was there any expert testimony about why the TLA was particularly good evidence because you would not find in this royalty-free license any significant compensation going from Radiata to Commonwealth? Absolutely, Judge Dyke. There was both fact evidence and there was expert evidence that's related to the first part of your question. There was evidence from CSIRO's own witnesses that the TLA was a, quote, arms-length transaction. That's at A235. And then there was evidence from— It could be an arms-length transaction and still involve additional consideration not reflected in the license fee. Right. And there were other— There was other evidence including PWC's valuation of the 069 patent at A947, which our expert used along with another piece of data, the Macquarie settlement between CSIRO and Macquarie University on how to apportion out what was attributable to the 069 patent and what was not. And that was discussed by our expert, Mr. Bakewell, and some of that's reflected at A1356 and 1378 among other places. So, yes, there was absolutely an attempt to take that into account. This is just for purpose—I'm just trying to refresh my recollection because there are a lot of numbers thrown around. Weren't the numbers for the TLA not majorly different than the numbers that were thrown around in the negotiations? Isn't the TLA problem the fact that the price of chips decreased dramatically during the damages period, so now you want those numbers to reflect that decrease and the other side does not, obviously? So, Judge Prost, the TLA, of course, is tied to a percent of chip prices. That's right. So the numbers themselves at the earlier period of time were not that significantly different from the award here. The difference is that if you then apply the percentages to the declining chip price, it gets you a far lower number, right? Well, that's certainly true. I mean, I do think that there's a problem here fundamentally when you have a district court that uses the end product as the base as opposed to at least starting with the small assailable unit precisely because he's looking to that, and this is at A4— Yeah, but the trouble is if you have a license negotiation or licenses that are based on the end product, it doesn't seem to me that it is reasonable to say that those should be entirely ignored. It may be that there should be a preference for a license with respect to the small assailable unit, but if you have licenses, license negotiations with respect to the end product, surely we shouldn't throw those out the window entirely. So Judge Dyke, we're not arguing that in the context of this case that the district court was required to ignore those altogether, although the CSIRO rate card has a number of fundamental flaws in it, and it is improper for the district court to rely on that. Well, I was talking more about the Lange negotiation. You have a situation where that is years after the hypothetical negotiation. It's after CSIRO has begun its enforcement campaign pre-ebay in which CSIRO is seeking injunctive relief. And it raises real serious concerns for district court to potentially use that as a starting point precisely because it will chill negotiations. You have the same policy concerns that you have embedded with using litigation-driven licenses, except this isn't even a license. It's not even offered. Most of the district court could say it was an inchoate suggestion, and that's certainly going to have, I think, real ramifications in terms of chilling negotiations. I don't understand why the offer is made in the course of negotiations isn't just as pertinent as a license. There may be reasons for disregarding it because it's litigation-driven and so on and so forth because it reflects the holdup value. I mean there are arguments, but it doesn't seem to me that the mere fact that it's a negotiation rather than a license renders it irrelevant. Well, I don't think that this court has ever sanctioned the notion of using negotiations as a starting point. And in fact, in Hansen v. Alpine Ski from 1983, this court rejected the notion of using offers as a starting point precisely because they weren't a, quote, established rate. I think those concerns are presented here. And with respect to one of the questions that Chief Judge Prost asked a few minutes ago, I think it's important to also understand that the parties at the time of the hypothetical negotiation absolutely knew that chip prices were anticipated to decline. That was in the Skellern letter itself, A1261, that chip prices would eventually become a commodity. Cyrus Expert conceded at A514 that chip prices would have been expected to decline. But isn't that precisely why the district court looked at the chip and decided it wasn't a proper reflection of a good base value because it wasn't going to reflect the value of the patent because the chip prices don't reflect the full value? I mean, you can disagree about where they start. There's lots of evidence going both ways here. But the district court made some pretty specific findings on this and considered your arguments and rejected them and found that not only was the chip not the proper base, it found that it tried to separate out the standardization from the patent value. The district court, when it looked and said, not only – even though this is incorporated in the standard, what's driving the success of this is the technology, not just the standardization. I mean there are quotes in the district court's opinion. I understand it's a very complicated thing here. But at the end of the day, the district court seems to be in the best position to look at all this and make a judgment. Judge, a number of the points that you made. First of all, you can try to characterize them as fact points. They're really not. They ultimately come down to legal issues. I mean there's no basis for the district court effectively using the entire market value. If you're going to use the entire market value, you've got to have the factual findings that the entire market value rule requires. They didn't argue – Syra didn't argue that the entire market value rule applied, and the district court didn't purport to find that it applied. But nonetheless, he identifies the base as, quote, the revenue pool implicated by the infringement and says I'm going to use the revenue pool for end products. And then the rate is going to be, quote, the percentage of that pool adequate to compensate the plaintiff for infringement. That's at A4 of his opinion. That is fundamentally inconsistent with this court's decisions in Laser Dynamics and Vernetics. Now, to be sure, the district court didn't have the benefit of Vernetics at the time of his opinion. But Vernetics tells you that applying the Supreme Court's decision in Garrison, you have to apportion in all cases unless the entire market value rule is satisfied. There's no factual findings. You're conflating two things. There's the entire market value rule versus the small saleable unit, and then there's this other notion of apportionment. And maybe Erickson is the best case that illuminated that. I mean they sort of differentiated. Entire market value – whatever you're going to use as the royalty base, the key here is to do an appropriate apportionment. And certainly in the absence of a jury, as we have here with the subvent trial, all the concerns that drove a lot of what the rejection of the entire market value rule in most circumstances was the fear that juries would be unduly influenced by these large numbers. And that obviously doesn't apply here as well. So respectfully, Chief Judge Prost, I think that Erickson makes clear that there are two rationales for the rule. One is substantive, and one is evidentiary, but not that the entire market value rule isn't implicated if you don't have a jury presence. And in fact, that wouldn't make sense at all. Garrison makes clear – But Erickson talks about apportionment being the key. It sort of drifts away from entire market value, which has a value because of the evidentiary concerns. But it says – but at the end of the day, the be-all and end-all is apportionment. But apportionment, of course, is just the flip side of the entire market value rule. No, it's not. No, it's not. That's not true. The central apportionment concern here, it seems to me, is the failure of the district court to apportion for the fact that this became the standard, for the holdup value of this, which is entirely separate, a separate issue from the entire market value rule. You focus so much on the small assailable unit, and there are arguments why you should focus on the small assailable unit. But the real problem here is the failure to take account of the fact that this became the standard. And the law of the value of the patent is the fact that it was adopted as a standard. Judge Steich, I certainly agree that the standardization issue here is a real problem. And respectfully, Judge Hughes, the district court didn't take into account standardization in the way that Erickson says that it's supposed to. He did exactly the opposite of what Erickson requires. He gave them the benefit of standardization. But ultimately, the premise of laser dynamics and vernetics and the whole point of apportionment is to get down to the component that the market has put a value on, the component that actually practices what's inventive about the patent. Because presumably that is going to be the best way of being able to determine what the value of the invention is in a multi-component product. Well, why does that mean that we should ignore negotiations and license between the parties that don't focus on the small assailable unit and instead focus on the end product? It seems to me you're arguing that we must ignore the party's focus on the end product. I don't follow that. Judge Steich, first, I'm not arguing that the court has to ignore that. Erickson contemplated that the court, for example, could consider licenses that were based on end products, but you had to engage in apportionment. But part of the problem here, the fundamental problem with the district court's approach was to reject Cisco's entire damages model. And the primary reason for that, it's an A23. The primary reason for that was because it used chip prices rather than end prices. And so the district court's fundamental effect… He said those chip prices don't properly reflect the value of the patent. It seems like that's okay and we can go with that. The problem here seems to be that his separating out the standardization value is a little suspect. And so I don't understand why you keep going back to the first point because what you should be arguing is he didn't apportion properly. I don't see any reversible error in him deciding not to start with an artificially low chip rate. I mean that's exactly what Erickson was intended to allow and not have an inflexible entire market value or small saleable unit rule. So why isn't the problem here the apportionment? So Judge Hughes, I absolutely agree that apportionment here is the fundamental problem. And it's a fundamental problem for all of the reasons that you just articulated. It's the fundamental problem here because it failed to account for the effects of standardization. Respectfully, I think it also is a problem here because it does take in-product value and use that as the starting point. But you agree that that's not, as a matter of law, improper as long as proper apportionment is done from that base. So Vernetics itself specifically says that determining the small saleable unit is, quote, simply a step toward meeting the requirement of apportionment. And so I agree with you. Yes, you could, as a logical matter, start – It's not an apportionment problem at all. You could have somebody focus on the small saleable unit and still not apportion to take into account the value attributable standardization. They're separate issues. I completely agree. And I'm not trying to conflict them. There are multiple problems here with the district court's reasoning, any one of which requires remand. The failure to apportion to take into account standardization by itself requires a remand here and reconsideration of the damages award. I'm just saying that there are additional reasons as well. I think you're well over your rebuttal time. We'll restore three minutes of rebuttal, and we'll add five minutes to the other side to try to keep it even. Thank you, Chief Justice. Thank you. Judge Proust. Thank you. Good morning, and may it please the court. We have obviously some fundamental disagreements. Can you start where your friend left off, which was talking about the impact of standardization on the numbers used here and why you think presumably that the district court got it right and properly accounted for standardization? Absolutely, Your Honor. First of all, to answer Your Honor's first question, there is no RAM commitment. The district court found as a matter of fact that there was no RAM commitment on G, which are the overwhelming majority of the products. No, okay. Let me start. So the first question I asked your friend was, in the absence of a RAM commitment, let's take that as a given, is it still not the case that the district court has to consider, take into account, and put the value attributable – account for the value attributable standardization? Yes, and the court was clear about that in Erickson, but here the district court did exactly what was required. Erickson – How did he do that? I think that's where we're having trouble. Well, number one, the district court found that this was – that this patent covers the core of the standards. So we're not talking about a minor feature where we're worried about CSIRO being in the right place at the right time. Well, I don't understand how that's an answer to the problem. Well, because it's the core, Your Honor, he found that the 069 patent played a significant role in the commercial success of 802.11 products. So he found that the – But what is – we're talking about standardization here and whatever impact is attributable to the standardization. So how does that account for it? Well, he found that this patent was responsible for the success of 802.11 products, generally speaking. And when he apportioned out the patented versus unpatented features, he also talked about the benefits that were – that this patent provided to those end products. But where do you strip out the standardization value? I read the opinion three times. I don't find it. It seems to me he did the opposite. It seems to me he increased the royalty rate because of the standardization rather than to strip it out of that calculation. Well, Your Honor, he did walk through Georgia-Pacific 8, 9, 10, and 13, and he did talk about the value that this technology added to it. And I think we should be mindful of – Yeah, but what about the standardization? I mean, look at page 826, his opinion, and where he talks about Georgia-Pacific factors to determine adjustments. There's a sentence towards the end of the page, although other courts have made specific adjustments to the Georgia-Pacific factors to take a RAND commitment into account, specific adjustments to the overall framework are not necessary here. Well, that's correct, and I think he's talking there about the RAND context. And in Erickson, this court rejected the idea that the Georgia-Pacific factors need to be modified in all circumstances or in a prescribed way. We're talking here about standardization and not about RAND. One of the – Yeah, but where did he take into account the need to strip out the value attributable to the standardization? Now, to be sure, to be fair to the district judge here, he didn't have the benefit of Erickson when he wrote this opinion. But in the light of Erickson, how can this be sustained when he failed to strip that out? Well, he didn't have the benefit of Erickson, so I think that we need to do a little bit of the work and go into what he said to find where he said what could be – what value this patent added to the standard versus what value the standard added to the patent itself. And he didn't say very much. This is your problem. I mean, I'm looking at his opinion and looking at the factors 9 and 10, which is, I think, where you account for it. In no way – that's in a paragraph starting at the bottom of A28, 27 of the opinion, going to the top of A29, 28 of the opinion. That paragraph doesn't even start to suggest that there should be an apportionment for the standardization versus the improvements of the technology. It talks about the improvements of the technology, but it nowhere says that we have to consider an adjustment for standardization. In fact, again, he does the exact opposite and says these favor an upward adjustment. Isn't that precisely wrong? Because it should favor a lower adjustment, or at least he has to explain why a lower adjustment is not proper when he's talking about standardization. Your Honor is absolutely correct. He didn't do it in a mechanical way, and Erikson doesn't require that there's a particular format. Mechanical way? How did he do it in a non-mechanical way? Can you point to any place in his opinion where he says he considered a downward adjustment for standardization? Well, if you look at footnote 12, he doesn't say that he is doing that. That's on A22 or A21. Yeah, that really doesn't do it. I mean, I have that one marked too because we scoured the opinion looking for any accounting, and all he says here is this is not an indication that the value of the patent increased solely because it was included in the standard. Rather, as a whole, that doesn't do it for you, right? What does that mean? It shows that he was aware of it. These issues were certainly present. But he didn't look at it. Unfortunately, he just said, well, part of it may have been due to standardization. Part of it may have been due to technology. He didn't explain why the number he arrived at considered whether to depart upward or downward. I think there are some unique facts here that help. First of all, let me answer your earlier question about whether considering the value of standardization versus the value that the patent as the standardization would require that the adjustment for factors 9 and 10 be upward or at least neutral. There are circumstances where we know, as Judge Rader referenced in his concurrence in Apple, that standardization may simply reflect the value that's inherent in the technology and the fact that it's incorporated into the standard doesn't mean that that value is destroyed. We don't necessarily lower it just because it's been increased. But he didn't make that finding here. But he did find that the IEEE on repeated occasion adopted this. Now, remember that at the time… Yes, but they didn't say they adopted it because it was a superior technology, nor did he make that finding. He did not, but if you look at the record, that evidence is in there. Well, we're not supposed to make findings. He's supposed to make findings. Well, Your Honor, the standard review here says that if the record as a whole… No, not if the judge didn't address the issue. We don't sustain a decision which is based on the absence of a finding because the judge could have made the finding based on the record. Your Honor, I respectfully disagree. I believe that the standard requires that if the record as a whole supports his conclusions. I mean, he's not required to cite every… But he has to make a conclusion. Again, where in this opinion did he make a conclusion that the value here is attributable to the technology and not to the standardization? Or decide that it's attributable in part to both and try to apportion it? He didn't make that. He didn't reach that conclusion, but I think that the preliminary facts that get him there are certainly present throughout his opinion. Could I move you on unless there are further questions about this? I want to move you on to the TLA where it seems to me he may have made an additional error because he rejected the TLA primarily, not exclusively, but primarily because of the 1998 date. He ignored the fact that the TLA was amended in 2001 and 2003, much closer to the alleged infringement and the hypothetical negotiation. What was the basis for ignoring the fact that the same rates continued after those amendments in 2001 and 2003? That CSIRO is contractually bound to honor those rates. Well, but it had the ability to satisfy the agreement. It did not have the ability to satisfy the agreement. The evidence in the record is clear. CSIRO did not have the ability to renegotiate the price terms of that agreement. But it says that if there was a transfer of all of the assets, which there was, to Cisco, it could terminate the agreement, no? It could terminate the agreement only if Cisco was unable to fulfill the other development provisions of the TLA. Where does it say that? It says it's right in the TLA. Where? Give me just a moment. I'll find that for you, Your Honor. Well, I don't want to hold you up. I don't find it there. I think – let's assume hypothetically that I'm correct, that they did have the ability, that Commonwealth had the ability to terminate the agreement. Under those circumstances, doesn't the fact that the royalty rate continues have some significance? Isn't it incorrect under those circumstances to dismiss the agreement because of the 1998 date? Under that hypothetical? Under that hypothetical, yes. But there are four reasons that he rejected use of the TLA. The timing is only one of them. So there are still three other legs on which that decision to reject the TLA can stand. And remember that he's sitting as a finder of facts. What are the other reasons? Number one, the close relationship between the parties. The fact that an inventor was one of the founders of – But by the time the amendments took place, there wasn't a close relationship. It was Cisco. Well, number two, the development proceedings. I think that that is actually – the development requirements. I think that is actually the most important requirement. CSIRO didn't enter into this agreement with the hopes that this was going to be the end-all, be-all of every revenue stream that it would ever get. It entered into this agreement in order to establish the commercial viability of its product. And that's a very important thing. This is how research institutions and universities around the world every day get their technology that they've developed in the laboratory. What you're suggesting is that there was compensation apart from the royalty payments going from Radia to Commonwealth, correct? Yes, absolutely. And the testimony from CSIRO's witnesses were that that was actually more important to them. In fact, they had an incentive to keep the royalty low because they wanted to encourage Radiata and then Cisco to develop this commercial technology. They had a requirement that they had to get a certain number of products into the field. What they hoped was that if Radiata and then Cisco could establish the commercial viability of this technology by developing the products from the laboratory into the commercial space – Did that not happen by 2001 and 2003? By 2001, 2003, it was still in the process of happening. What's the fourth reason? And the fourth reason is the fact that it was based on chip prices. And the district court found that chip prices, because of widespread infringement, did not reflect – What's the evidence of widespread infringement? That's contested. Cisco says that 70% of the chips were licensed. 70% of the chips were licensed by the time that we got to trial. 70% of the chips were not licensed at the time of the hypothetical denunciation. Well, what's the evidence that the vast majority of chips were not licensed at the time of the hypothetical denunciation? Every single one of CSIRO's licenses was put into evidence, and the earliest one was 2008, except for the TLA. Other than the TLA, which was a handful of chips which were not used in the kind of consumer products that were the majority of the accused products here. Except for that tiny, tiny sliver, the entire market was unlicensed until 2008. Let me bring you to the more global issue. As you know, we've had a lot of amicus briefing in connection with this appeal, which is somewhat unusual. And it goes to kind of the generic issue of entire market value versus small, saleable unit. And certainly, if you look at our case law in totality over the last decade, the movement has been away from the entire market value in the absence of, as your friend said, of evidence of a driver of demand for the end product. And certainly towards the small, saleable unit. Why, on that basis, shouldn't we be at least suspicious of the district court's failure to adhere to any of those principles? Because the district court did something very different. Very recently, this court said in Summit 6 that there's no one way to calculate a reasonable royalty. And the district court is, or finder of fact, is entitled to rely on licensing evidence. Entitled to rely on the analytical method, among a handful of other things. This district court was presented with at least four options of how it might start the reasonable royalty. But certainly, the cases over the past decades began with a suspicion, a gross suspicion, of overuse of the entire market value rule. And the need to move away from that in the absence of a finding that there's a substantial driver of demand towards the small, saleable unit. And that seems consistent with the overall theme of the cases, which is we need to do an appropriate apportionment analysis. And the small, saleable unit is consistent with that. Right? Yes, Your Honor. And that's why we at trial were very careful to avoid the entire market value. If you look through the district court's opinion, not once does he mention the price of an end product. And so that wasn't his starting point. His starting point was the… But that's where he ended up. He ended up with a number which is related to the cost of the end product. No, he ended up with a number that was consistent regardless of the price of the end product. Whether it was one of Cisco's $1,000 routers or whether it was one of its $75 consumer routers. The royalty for the Wi-Fi functionality, which is what Erickson says. You have to look at the incremental value of the patent intervention as the end product. That functionality is the same in a high-end router and a low-end router. And he ended up with a royalty that had no relation. It didn't go up or down at all with the price of the end product. He started with what he found was Cisco's own… The best reflection of what Cisco itself ascribed as the incremental value of this patent to its product. You're talking about the license negotiation. Correct. Well, your friend says, and maybe some of the amici say, that there are policy concerns with taking offers that were made and never accepted and discussions of the settlement that never resulted in actual licenses. That there are policy concerns for not placing heavy reliance on that because that would chill the negotiation process. I mean, why isn't that a fear? Sure. The federal rules of evidence, 408, provide a mechanism. And certainly in the Eastern District of Texas, there are local rules that provide a mechanism for parties to shield those discussions from the evidentiary record. Cisco elected not to assert 408. Yeah, but that doesn't have anything to do with this. I mean, the problem with those negotiations is that they were negotiations where there was a holdup value that was being paid as part of the negotiation because it had been adopted as part of the standard. That is the fundamental argument as to why those negotiations are not all that helpful. There is no evidence that there was holdup. In fact, there were other options that were out there. There were other versions of Wi-Fi. 802.11b was one of the non-infringing – one of the two non-infringing alternatives, PBCC. You mean when the standard – after the standard was adopted, you could use something else? Correct, your honor. In 1999, the IEEE adopted 802.11a, which is infringing, and 802.11b, which is non-infringing. The market really took off in 2004 with the adoption of 802.11g, and I think that this may help us with the standardization problem. At the time when the IEEE adopted 802.11g, which is really when the market exploded, it had an option. It could have gone with the non-infringing b-type technology or it could have gone with the infringing a-type technology. It elected – the evidence shows that it was because the technology was superior, because it was faster in particular, to go with the 802.11g technology. Now, Cisco itself said that it was the speed of 802.11g that drove the premium in the customer demand. But Cisco's own admission of what is attributable to – what part of the standard drove customer demand. And if you do the math, Cisco said that it allowed it to do a 20%, 25% premium. That's about a $30 difference at the time of the hypothetical negotiation. So Cisco itself – So has this patent expired? No. Has this patent expired? Yes, your honor, it has expired. And is there any other litigation pending beyond this dispute now with respect to this? There is not. But I do want to say that at the time of the hypothetical negotiation in 2002 and 2003, the IEEE had the option of going with non-infringing technology. It was already in the standard when Cisco elected at the district court level to assert two non-infringing alternatives. Both of those were standardized. In fact, one of them was baked into the 802. One of them was – Your evidence, both the rate card and the line discussions took place after the G standard was adopted. That's correct, your honor. But the district court found as a matter of fact, and it is entitled to deference on that, that those discussions were the best reflection of what Cisco would have done just a short – a year or two before at the time of the hypothetical negotiation. This court might reach a different conclusion confronted with the same evidence, but that's a factual finding that is entitled to deference. It is not a legal error. Thank you. Did you have something else? Your honor, if I may just take one more minute, if you have a few more seconds. In the record at A1274, section 16.3 of the TLA says that CSIRO may change the – it's incorporated by reference, but it says it may terminate the agreement if there's a change in beneficial ownership, direct or indirect, which would adversely affect the licensee's ability to comply with the obligation under this agreement. That's section 16.3A. Absent that, change of control or ownership does not allow CSIRO to terminate the agreement. Thank you. Thank you, your honor. And responding to that, Judge Dyke, CSIRO, of course, had the ability to agree or not agree to a whole series of amendments that were made in 2001. Everything was up for grabs, and yet the rate ended up staying the same. Chief Judge Proce, you asked if there were other cases pending. My understanding is that CSIRO still has a case pending against Mediatek involving this same patent in the Eastern District of Texas. With respect to some of the responses that my colleague has made, particularly about the issue of standardization, this absolutely is a case of lock-in. At the time of the 802.11g standard, you had a representation that was being made to the industry that they would make a RAND commitment. Now, they ultimately didn't follow through on that, but that helps to explain what happened with respect to 802.11g. And with respect to 802.11n at A2914, it was said, quote, it was decided early on in the process that backward compatibility with legacy 802.11g was mandatory, and as a result, OFDM became the modulation of choice. So this is a classic case of lock-in, and it's exactly why standardization has to be taken into account. Can I ask you about that? So let's assume we disagree with you about small-assailable unit, and we think the base he started with is okay, but we see problems with how he apportioned for standardization. What can he do based on this record to correct that error, or is it going to have to be reopened and have new expert reports and new data put in? Well, Judge Hughes, I think that under any scenario, there would have to be some kind of a remand. Would the court be – Well, that's what I'm asking. What is the judge – I mean, it's not going back to Judge Davis, but what's the judge going to do on remand with the evidence he or she has as opposed to, is there a need for additional evidence? Respectfully, Judge Hughes, you talked about the two pieces of evidence, right? There's the TLA stuff, and then there's their rate card. Neither of those seem to be particularly satisfactory evidence. Well, Judge Hughes, depending on what this court says, I think the district court would presumably have to revisit its consideration of the TLA. I mean, some of the issues that the district court used in not considering the TLA were the fact that, again, that it used chips versus end products. But he didn't consider the amendments. He didn't consider the amendments at all. That's right, Judge Dyke. And with respect to the provision that opposing counsel just read, that's just one of the bases for terminating the agreement. In fact, an alternative basis is it disposes of all or part of its assets, which is what happened with the transfer to Cisco. That's right, Judge Dyke. And with respect to some of the other district court findings that related to this, the whole issue of widespread infringement, the only thing the district court cites is – and you'll find it in the record – is A395. There's no evidence whatsoever, no evidence whatsoever, that there was widespread infringement at the time of the hypothetical negotiation. And, in fact, there wasn't widespread infringement at the time. What about the argument that the licenses weren't entered into until later, 2008 or whatever the date was? Well, Judge Dyke, it's certainly true that some of the licenses were entered later in time. The one license that certainly existed at the time of the hypothetical negotiation and was indeed amended contemporaneous with the hypothetical negotiation was, of course, the TLA itself. And setting all of that aside, the district court committed real error in relying on the CSIRO rate card because that did depend on the 25 percent rule of thumb that this court specifically rejected in UNILOC. The district court didn't grapple with that at all. And if this court's going to give guidance for remand, it would be helpful to have guidance that that's impermissible, that you can't get in through the back door, which you can't bring in the front door. The district court rejected CSIRO's expert for many of the reasons – for many of the same things that CSIRO's consultant did in crafting the rate card in the first instance. If the court has other questions, I see that I'm over my time, but thank you very much. Thank you. We thank all counsel and the cases submitted.